Thank you, Your Honor. Good morning. Michael Reese Davis on behalf of Jason Scott. Jason Scott illegally possessed three videos containing child pornography. The three videos had been downloaded and automatically saved from a peer-to-peer system known as LimeWire, and it had been automatically saved to a shared folder on Mr. Scott's computer. All three videos were downloaded on the same day, and all three were only reviewed once. There's no indication or no evidence that those three videos were cataloged or organized, hidden or protected by Mr. Scott. Indeed, Mr. Scott's computer had no library of child porn, had no collection or anything of the sort. I don't actually know. That wasn't clear. I'm assuming that it was, because in the undercover operation, the agents were able to go onto the computer, so I would assume yes. Mr. Scott did not pay for the videos. He didn't trade for the videos. He didn't barter for the videos. Mr. Scott's computer did not contain any emails, any chats or indications that he was trying to converse with children or with other child pornography possessors. When you say he didn't barter, you mean there was no communication, but the system essentially bartered, because he made his available and the system effectuated a barter, even if the key question is, what was his knowledge of that bartering? Is that basically where we are? Absolutely correct. There's no indication that Mr. Scott was aware of the file sharing nature of LimeWire or that he was ever aware that his files had actually been shared. You're absolutely correct. So you get two points enhancement, as in Barker, right? Baker, if you distribute, and the guidelines were written in a world where it's like drug distribution, an affirmative distribution, you get two. If you just possess it on your own, nothing. If you give it to somebody, two. And then if you give and get the exchange, you get five. That's basically the scheme? That is the scheme. And therefore, the question is, when you get the world of the internet, where things are being done for you, should you get the five when there is an exchange going on? And what is the, what burden of proof does the government have to show? That's, that's where we are. And you're just saying there was no showing at all that he knew this was happening? Absolutely. Yeah, that's correct. What about his knowledge? He had some computer training, didn't he? Some electronic training? I believe most of his training, he was going to become a machinist. Well, I don't know. I picked this up somewhere that he went to a technical college and had electronic construction program and computer and electronic construction program was the course he took. I don't, is that correct or do you know? If that's in the pre-sentence report, that is correct. But there's, I'm not aware of any training on internet programming or any type of. If it's there. If it's there. The district court and the government would have to point it out. But if it's there, that's a problem, at least under how some circuits interpret this guidelines. Right? The inference can be drawn from computer knowledge that it's flipped on, he would know. That's just where some courts have gone, right? That would certainly be a step towards proving knowledge circumstantially. However- It's got to be litigated. It's got to be presented. And also one thing I would point out, there is the timing aspect. And that is the videos were downloaded automatically in July of 2010. The agents came along in October of 2010. And so there's no indication of whether there was any trading or anything going on in return for those three videos. If that makes sense. If there's any evidence that he traded any videos, that would be support for knowledge, wouldn't it? That would be. But there is no such evidence. And there's no evidence that when someone gets on LimeWire and however that works, comes and looks on your computer, there's no evidence that the computer owner is notified of that. And I'd give a good example. Back in the early days of the Internet, I guess, Napster was around. And a lot of people were going on to Napster to get music. I think the statute is run, so I can say that I did that at least once before I really was We are recording this argument, you know. Is that for outside use? But in all candor, I understand that that was a peer-to-peer file sharing. I was never aware that someone else could come through the Internet and get my music and go back. I was doing it simply to get the music. And I submit to you that that's the case that we have. We have a case of simple possession of child pornography. And I think it's important, no prior convictions, no prior charges, no history or indication that he was sexually abusive or any predatory actions on Mr. Scott's part. What did he get? Excuse me? What was his sentence? His original sentence was 235 months. This sentence was 108 months. However, the court applied the five-level enhancement under 2G2.2 based in large part upon the recent decision of the Gross case. And I believe that if you look at the dangerousness of Mr. Gross as compared to Mr. Scott, I think the two cases are worlds apart. And also in Gross, I don't remember specifically what the statement, but he admitted that he was aware of the file sharing function. I think he said something to the effect of, well, I didn't want people to come get much of my stuff or my computer. So you accept Gross's controlling authority. You're not asking us to deviate. You just think that it stands for your proposition that the defendant knew he was getting things in exchange. That's correct. Again, in all candor, I'm aware that the Sentencing Commission is considering some changes to 2G2.2, one of which, with regard to the five-level, imposing a quid pro quo, or at least that you need to distribute to another person. Well, that's already in the text, right? You have to get a thing of value. Correct, but the cases don't demand a specific quid pro quo. I believe the Sentencing Commission is planning on doing that. In this case, no quid pro quo. But also, I think they're planning or looking at imposing a requirement that you trade with a specific person, not some file-sharing peer-to-peer service. And then also, on the two-level, they're looking at imposing a scienter requirement so that it's not this type of peer-to-peer. But we argued at the district court level, five-level was inappropriate. We alternatively argued for the two-level. We have to vacate this anyway, right? Because the J&C reflects that he was convicted of receipt instead of possession. That's correct. And the J&C says 109 months, and it's got to be 108. So even without getting to the government concession on plain error, we're vacating this sentence because of errors made by the successor judge? That is our position, and I believe that's correct. Moving on to the supervised release and the special conditions issues, first of all, let me apologize to you in advance. I didn't get the letter. Camille was nice enough this morning to ask me what I planned to focus on, and she showed me the letter. And so I apologize if my presentation wasn't necessarily directed to that. Was that a slip-up from the clerk's office, or what happened? I really don't know. She showed me the letter this morning. I fall on the sword. It was probably my mistake or my bad. One thing I understand, the requirement that there be a contemporaneous objection, and I've tried a lot of cases on both sides of the V. In this case, we filed our written objections to 2G2.2 and to paragraph 10 of the PSR. I walked into sentencing that morning, and the court issued a memorandum overruling my objections. Mr. Scott and I then stood behind the lectern, and the court said, I've ruled on your objections. Mr. Davis, what do you have to say? I submitted. Mr. Scott, what do you have to say? He briefly told her he was sorry for what he had done, and the court imposed sentence. And I understand that now the argument is, well, I should have interrupted the judge or at the end said, hey, I object to whatever you did. I just . . . I don't believe that's appropriate. It just didn't seem appropriate to me to interrupt the judge. She was imposing her sentence. She was actually reading, and it didn't appear to me that an objection would have done any good. But that's the only way a district judge can know that there might be a problem. So that's . . . I understand. You're not the first lawyer who's been in the situation of . . . I understand. You appear before this judge time and time again, and you don't want to appear obstreperous. I understand that. We've all been there. Yes, sir. It's just . . . To me, though, and I agree with the court, and I understand that the purpose of the contemporaneous objection requirement is to give the judge a fair chance to correct himself or herself. I don't quite see why you have to interrupt the judge. I mean, after she completes a sentence, it seems to me you could make a record of your objection without being impolite or anything. Somewhere out there, there's the futility. It just seemed that it wouldn't have done any good. Anyway, I think the good news and the saving point, I believe that we have a strong case for plain error, even if the abuse of discretion does not apply. Fortunately for Mr. Scott, and unfortunately for me, the Duke case came out one month after the sentencing, and the Duke case involved the same judge imposing another lifetime supervised release. And the Duke case involved some pretty strong language of how it would be hard to imagine such a sweeping lifetime ban complying with the narrowly tailored requirement of 3583. And so I think we have error. I think that I agree with the government that the Duke case establishes that that was a plain error. If you look at all of the conditions that go with supervised release, not just the general conditions such as the right to travel and check in with probation and work requirements and all of those, but in this case, we also have the special requirements for which we have specifically discussed the lifetime ban on Internet usage, which in this day and age, you have kids in school and they're checking their grades and they're doing their homework. I fear for Mr. Scott's future, if that stands. And I believe the government agrees that that needs to go back to the district court. The second lifetime ban is on any unsupervised contact with minors. Mr. Scott is in prison. He's unmarried. He's 33 years old. He wants to get married and have kids, and that's such a sweeping ban, it may even apply to his unsupervised contact with his future children. The third is lifetime computer monitoring. And again, that's a very sweeping lifetime ban. If when he gets out, he's in his late 30s, that's a 30- or 40-year sentence. And the final is the lifetime registration as a sex offender, which is very, very serious. Under SORNA and Louisiana state law, that period would be 25 years. We agree with the government that this sentence needs to go back to the district court and that she needs to look closer at this, and hopefully I'll do a better job at the district court and articulate myself better and object where I need to. But of course, we have a number of cases that point out that in a situation like this, a defendant can always return to the court to try to get modified conditions of supervised release. For example, if he wanted to get married and have children or if he had a particular occupation that demanded some limited use of the Internet or whatever. And I think our cases have said that that's a factor that we can consider in determining the harshness of the conditions. Yes, sir. I believe we cited there's a Seventh Circuit opinion that has some language, and I'm picturing it, but not remembering saying that that really doesn't... Allowing the discretion doesn't really address whether the sentence is right. And I can tell the court that relying upon the subjectivity of a probation officer or a judge to lower a life sentence is not necessarily an easy proposition. And I just believe if we have a case of simple possession, no indication of a dangerous person, he wants to do his time, he wants to get on with his life, but these lifetime-sweeping bans, there's no way he's going to ever be able to get back to a normal life. And I'll save my remaining five minutes for rebuttal. Thank you. Okay, thank you, Mr. Davis. Okay, Ms. Domingue. May it please the court. I'm Camille Domingue. I represent the United States, who's the appellee in this matter. Beginning first with the enhancement for distribution. Judge Higginson, as you point out, this is, you know, one of these cases   who had a life sentence. And I think it's important And the government also submits that this is governed by gross. And, you know, gross makes it clear that there doesn't have to be a quid pro quo in the sense of I'm going to give you this now, you give me this money or you give me this image right now as in a contemporaneous exchange. But as long as it's out there and it's available. And perhaps it's good to contrast the opinion written by Ewan Baker where the court says, you know, in Baker, there's no scientific requirement at all. There's no knowledge requirement. He doesn't have to know that he's going to get something in return. Well, wait a minute, though. In Baker, that was exactly why we applied two points. Distribution doesn't require knowledge. But we specifically said compare the five points where you do have to be cognizant of the return. Exactly. And that's my point. So what's the evidence that was relied on by this district court that this defendant was cognizant that he was getting something of value? You have a repeated reference in the PSR and the PSR repeats the defendant's confession to the investigative agents. And if you read the paragraph in the PSR, I think it is paragraph 14 ROA 330 that repeats the confession. And the confession says he was aware that he was using LimeWire and BitTorrent file-sharing programs. And then it goes on to say that he admitted that he would use these search terms that are associated with child pornography on the file-sharing programs. I think the repeated use of sharing suggests that the defendant is aware that there is some sharing. Distribution, you agree, possession doesn't get you 5. Distribution doesn't get you 5. So if sharing just means share to someone else, you wouldn't get it. No, I would say, Your Honor, share You share with someone else but get nothing back. You don't get a 5-level enhancement. I think that's accurate. When you rely on paragraph 14, the government didn't object to any of the PSR? No, it neither did the defendant. Why did paragraph 10 in the PSR for the first sentencing say downloaded and traded which would get you 5 but in the PSR that was revised for the possession only guilty plea the language says downloaded and possessed. Why did that PSR change? Judge, I really don't know. That's well outside the record. No, it's in the record. Did you notice that change? I really didn't, Your Honor. I apologize. You have the PSR. It's very significant. In the PSR supporting the receipt the exchange conviction it says the facts would show downloaded and traded gets you 5. The PSR that you didn't object to when the guilty plea chopped him down to a possession only offense says downloaded and possessed. The word traded becomes possessed. I meant to say that I wasn't sure the reason behind it. I suspect what happened was in the negotiated plea agreement on the lesser charge of possession there was probably a reworking of the factual stipulation and that's why some of that language was taken out. If it were just downloaded and possessed then he doesn't even get 2 levels. I think that's right, Your Honor. If I possess it for myself you get nothing. If I give it to someone else The PSR says no facts to support, at least in paragraph 10 and it's explicitly modified then the JNC reflects he's convicted of receipt which is flat wrong, correct? Correct, Your Honor. The JNC also says 109 when the transcript of the sentencing clearly says 108. I suspect that's a typographical error and I would suggest that that alone wouldn't warrant a resentencing that's a type of typographical error that could be corrected by the clerk's office. But we've got to change the 109 to 108 also. Correct. I would suggest it's a clerical error and in any event the oral pronouncement is going to control. We all agree that it's 108, that it's not 109. That's in the transcript of the sentencing hearing and we all agree that's the sentence. The government here agreed that there was ineffective assistance the guy deserves a 2255. Right? Back at the beginning. The 2255 I can go into detail on that. No, no, no, that was the government and then the government agrees to reduce the guilty plea and the government's agreeing that the 109's wrong, the JNC's wrong and the government's agreeing suggesting to us that there's plain error as to supervised release. That's correct, Your Honor. Why not back down rule 32 the whole thing over and someone looks into PSR facts like he went to computer school which under any circuit law would allow you to infer I think. I think what Judge Davis was referring to is paragraph 55 of the PSR at ROA 334 that does talk about him going to computer school. Judge, I think this is a situation where there was no objection to the PSR by either side and I can see. There was no objection to the PSR by the government either. But if you look at the defendant's objections and if you even look at the defendant's sentencing memo, you know, there's not a detailed claim that I don't understand anything about computers. It's just that there's sort of insufficient grounds to support the enhancement. I think that there's enough there without an objection for the district court. I think share kind of implies a back and forth and this defendant you know, he knows that authority you've got for a kind of apply back and forth. I don't right now, Your Honor, have anything on that. I guess my point is. Is the government's position that any time peer-to-peer is found on a computer, that automatically gets five levels? Judge, I think that's what Groh says. Is that the position you're urging? I think it is. If we adopted that, wouldn't that conflict directly with other circuits? I don't think so, Your Honor, because I think it still requires, as you said, the availability of the back and forth. What about, you didn't discuss any of the other circuit law in your book. No. So let's do so now. What about the 11th Circuit, Vadnais case? Because that's, to me, I read it and they said, absolutely not. You have to have some knowledge element. It's not just peer-to-peer on your computer. But, Your Honor, I think what I would take issue with is what does knowledge mean? I read. I'm just asking are you representing the government urging us to adopt a rule, always peer-to-peer, that would split with other circuits? It would create a direct split. I think it would. So I'm asking you if that's a considered position you're recommending to us. Our reading of Groh's. Groh says when a defendant knowingly uses, and so I think what's important is that the defendant knowingly uses file sharing software. My position is, you know, the defendant in his sentencing memo goes into a lot of detail about how file sharing software works. That there's a default to a save folder and it's the Nutella network. My position is the defendant doesn't have to know all of that. And I think that that's what Groh says. Groh says the defendant has to knowingly use file sharing software. So, if the defendant, let's say someone else installs the Limeware on his computer and he has no idea that it's there, he's not knowingly using file sharing software. In Groh's, the man, and it was in their opinion, the man said, I know I got some, not much. I think what the defendant said in Groh's was, I was always sure, I was careful not to let them get too much off of me, not because I'm opposed to child pornography, but because I didn't want to get caught. But I guess my point is, and I think the question before the court is, what does Groh's mean in terms of how much the technical capabilities of file sharing software. And my reading of Groh's is that he just has to knowingly use the file sharing software and know that it is file sharing software. Not that it's some kind of, I'm not suggesting that if he knows it's Limewire, but thinks Limewire, you know, keeps track of his computer usage, that that's good enough. I'm not suggesting that. I'm suggesting that he has to knowingly use file sharing software without knowing all the technical details of it, because I just think that's beyond the, that's an unreasonably high standard. That's taking it a little too high. You know, you were talking about the three levels, nothing, two, five. This would be really taking it to a high level that your average child pornography defendant is not going to have a lot of technical knowledge about how this file sharing software works. But they know that it's sharing. They know that I put my stuff out there, I get your stuff, and you know, look at it this way. Let's say the defendant um, um, well, scratch that. This is a bad hypothetical. But my only point is, I think the question before this court in this case is, what does it mean to knowingly use file sharing software? Does it mean that you know it's on there, you know that it allows you to get the stuff, or do you have to know all the technical requirements? That's essentially the defendant's argument. I'm not a sophisticated computer user. I didn't know all of these details about, about LimeWire. It is, but absent an, and that, this is well settled in the circuit. Absent a specific objection to the PSR, the court can rely. If the government drops it from an exchange conviction, and then the government agrees to a PSR that changes traded to possesses, it couldn't get anything. Nobody wanted to then object further. None of that was called to the attention of the court in the district court. But you don't have to call anything to the attention. You've got to stick with it. You've got to object and say, this isn't possession facts, this is exchange facts, but you didn't do that. No, I understand that, Judge, but I'm telling you, I think what happened in the district court was, the government thought what was in the PSR, even though the word traded had been in the PSR, was still enough. Because of the reference to LimeWire, file sharing, I used these search terms. That was in Gross. One of the factors the court relied on in Gross was the use of these search terms that would allow a defendant to find the things that he's looking for in the file sharing software. That would be other people's stuff. I mean, he knows his own stuff. He doesn't need search terms to find his own stuff. He uses those search terms that are very particular, you know, very specific to certain, you know, these child porn guys, they have a lot of niche interests. So these are very specific terms that he used. I won't repeat them in court, but you look at them. He was looking for that stuff in other people's files, not in his own. He knew what he had. I mean, I think that's a fair inference. You may know how these peer-to-peer works. Certainly isn't in this record. I didn't know that what he was in was their file searching. That doesn't seem explained anywhere. I guess I understand what LimeWire is, but this record doesn't show that what has to have happened here for these three videos is he's in another person. You say it does show that? He's somewhere else and he's got a draw from it? No, no. Your Honor, I don't mean to suggest that this record is at all detailed on that point. What the record shows is that he admitted that he used the terms in the file sharing program. No, I don't think it says of another person. It says he admitted he used these search terms, and it has very specific ones that are key to his specific interests. The only reason he'd use a search term would be to find it in somebody else's file, wouldn't it? He wouldn't need to use a search term in his own file, would he? And that's my point, Your Honor. And that was one of the factors relied upon in Gross, was that Gross had used... I'm not understanding. I didn't know even that distinction. Because when I do a search term, I'm in the Internet. It's not somebody else's file. Every time I search for something, I'm in the Internet. No, but he's searching within LimeWire. You're telling me that... And that's in the PSR. Well, he's in LimeWire, but where's the explanation of what LimeWire is? I understand it's called peer-to-peer. There is not a detailed explanation of LimeWire in the PSR or in the factual stipulation, beside the fact that it's a peer-to-peer file sharing network that allows for the sharing of images. I think that's about all it's asked. Legally, and I'll stop asking, because there may be other questions, but legally, your position... It was important for me to understand, because there's no discussion of other circuit law, yet a lot of circuits have different interpretations. So, you are not saying any time a defendant's got LimeWire, they get the five points. No. That's not your position. Your position is, the government's got to prove some nexus, a scienter requirement, knowledge of LimeWire, and I take it what you're really relying on is the PSR statement to the inquiring agents that he knew he was using LimeWire and searched in LimeWire. That's enough in your mind. That's correct, because that is knowingly using the file sharing program, as opposed to my example... A defendant that has LimeWire wouldn't always qualify, then. Let's say that... It would have to be someone else that put it on there. Right. Let's say you would have a shared computer, and someone else loads the LimeWire on there, and the defendant is not even aware that it's on there. So, you have to knowingly use the software. So, there is a knowing requirement. And that's what Gross says. Gross says, a defendant who knowingly uses, beyond that in Gross, is the discussion of the particular facts of the Gross case. And my argument on appeal is, we rely on Gross, recent circuit precedent, directly on point, that the facts of Gross don't, you know, are narrower than the holding of Gross. That's the government's argument. Let me ask you this. Is there no ability to search the history of his use of the computer and the use of LimeWire? Is there not potential to do that? Judge, you're going beyond, well beyond my knowledge of LimeWire, which I've never personally used. And it's certainly not in the record of this case, Your Honor, about what the capability of that is. All right, I'll move on to... I'd like to address the questions that the Court sent. And let me just explain. This comes up in other contexts so that you'll kind of understand what the Court is facing. In the context of immigration appeals from the BIA, which you're not involved with, but sometimes there's a motion to stay a deportation. And the government says, oh, we don't oppose that. But nobody provides that the standards are met for a stay. And we've said to the government, even though you agree to the stay, we're not going to enter a stay unless you tell us whether the four elements are satisfied. And many times, the government has come back and said, no, the four elements aren't satisfied, yet the government doesn't care if there's a stay. So here, what we're facing, and this is not the first case, but it's a question of whether the government says, well, actually, in your case, you said remand is required, is your word, as to the two conditions of supervised release, but you haven't made any showing, particularly as to the fourth prong. So you know what the questions are. So just go ahead and address that. I mean, does the Department of Justice take the position in this case that the fourth prong is satisfied? And if so, how? Well, let me run through your questions in this order, starting with the ones that are easiest to answer. The first question is whether the Court's ever bound by the government's confession of error. Absolutely not. The case that's most often cited is United States v. Claiborne, in which the Court expressly refused to accept the government's confession of error. And I can certainly provide a 28-J letter with all of these citations. The third question you asked was whether, even in light of a confession of error, this Court has full discretion to do something else. The answer to that is absolutely, absolutely yes. The second question, which is sort of related to the third one, is what weight should this Court give the government's confession of error? I found an older U.S. Supreme Court case, a 1942 case, Young v. United States, where the Supreme Court talked about the weight that should be afforded the government or the state's confession of error. And that case basically says that the government, the state, is entrusted by the people with the obligation to do the right thing, and so it should confess error when it's necessary, and that the Court should give it great weight. That's the phrase that the Supreme Court used. But the Court still has an independent obligation to review what's happened, and that's what this Court has held over and over again. Now, specifically getting to the fourth prong in this case, the United States has confessed error as to only two of the conditions that are at issue. That is the no contact and the no Internet usage. And basically, the confession of error, you know, we defend a lot of these on the third and fourth prong of plain error, where there's some daylight in the Court's ruling. But in this particular case, if you look at the language in Duke, there's not a lot of wiggle room there. The Court in Duke says that we simply cannot imagine a situation in which an absolute lifetime computer ban is going to be permissible. And they said something very similar with regard to an absolute lifetime ban on association. But that goes to the first and second prong, not the fourth. It does, Your Honor, except for the case law of this circuit, like John, that's held, and even Ellis, the case that ultimately refused to grant relief under the fourth prong, says, you know, we take a hard look at the second prong, because we look at the gravity of the error. That's what the Court said in John, and even in Ellis. You know, in Ellis, Judge Higginbotham said, you know, this is not an error that's settled or categorical. Well, in this case, at least since Duke, it's very clear. That's the second prong. Except that this Court has said you look at the degree of the error in evaluating the fourth prong. Let me refer to a recent case of ours, U.S. v. Segura, 747 Fed Third 323. This is not a pop quiz. I don't expect you to be familiar with that case. But an opinion by Judge Stewart in 2014 talked about the fourth prong. And here's what it said, and I'm going to ask you to apply this standard to this case, and you tell us whether the government says it's met. He says it's limited to errors that would shock the conscience of the common man, serve as a powerful indictment against our system of justice, or seriously call into question the competency or integrity of the district judge. Are those standards, is this case so bad that those standards are met that the common man would feel that it shocks his conscience? In response to that, Judge, I would point out that we are talking about lifetime bans. And Judge, I'm very familiar with your dissent in Escalante Reyes, where you make a distinction between errors like a statutory interpretation and errors that go to core liberty concerns. You know, this Court has characterized the right to associate with persons as a liberty interest. So we are talking about lifetime restrictions that would impact, at least with regard to minors, liberty-type concerns. And these are lifetime restrictions. Mr. Scott is 34 years old. A lifetime restriction for him is a very long one. And again, I keep going back to the language in Duke, saying these are never going to be appropriate. I'll also mention something that the Court would probably not be aware of, but certainly came, you know, was part of our thinking when we were evaluating whether to confess error. And that is what happened in Duke on remand. On remand in Duke, Judge Minaldi reduced his lifetime term of supervised release to five years and converted the absolute ban on association with minors to a conditional ban where Mr. Duke could get permission from his probation officer in order to associate with minors. And again, I know you've pointed out that I think it's in your dissent in John, that this is a case-by-case analysis. We don't tether the fourth-prong analysis to what's happened in other cases. He did as well. But a U.S. Attorney's Office trying to figure out what's the right thing to do. This is a timing problem. If Mr. Scott had been sentenced, you know, just a few weeks later, after Duke had been published, I am very confident, based on what happened on remand in Duke, that Mr. Scott would not have gotten a lifetime associational ban or a lifetime ban on computers. I'm repeating the question. You're doing a perfectly professional job of addressing this. Again, the bottom line is, does the Department of Justice take the position that this is a judgment against our system of justice such that the fourth prong is met? Yes, Your Honor. I apologize to the Court for not addressing that in my brief. But that was part of our analysis when we determined that we were going to confess error, at least on those conditions. Now, as to everything else, we're defending on a no-error basis. Or at least with regard to the monitoring, not a plain error, in light of the comments in Seal Juvenile that the case law is a little bit split on this, even within the circuit. So we're really only talking about the two conditions on which we confess error. And it is the government's position that as to those, the fourth prong is satisfied. We would be abusing our discretion if we did not grant fourth prong relief. Is that right? Again, I hate to keep repeating myself, but yes, because of how these conditions are permissible. That is never permissible. Distinguishing it from cases in which this Court has declined to exercise its fourth prong discretion. Let's say, for example, where there's an error in a guideline calculation, but ultimately these are advisory guidelines, and the Court justified the sentence, and the sentence is not so far out of kilter. These are errors that this Court in Duke characterized that these conditions are just not permissible in any circumstance. Actually, the questions interest me too, on the Rule 52, plain error, miscarriage. So I'm in agreement with Judge Smith, and I appreciate your coming so prepared, because one value to the government coming prepared and briefing it, at least as we have this dialogue, because as I understand it, and this is the question, is it still true that if you do a confession to us now, that's been approved by the Solicitor General? If it's done this way? Well, not by the Solicitor General. There's a consultation requirement with my contact at DOJ's appellate, DOJ appellate, at the Criminal Division's appellate section. So two levels are approving the confession of error? Yes. So this is, there is a sort of a consultation within the office where we talk about it, we decide this is what we need to do, and then I memo my contact at DOJ's appellate division, and they either concur or they tell us, and you know, sometimes they say no, we think you should try to defend it under the third or fourth prong, or, you know, so they, we do. Yes, Your Honor, there is a consultation. We took a little bit of your time up. Do you need it? No, Your Honor, I appreciate it. Thank you, Robert. Okay. Mr. Davis? Thank you, Your Honor. I'll be brief. And in defense of Ms. Domain, she was not handling the case at the district court level. Mr. Walker was, and in response to your question concerning the changes to the PSO, those were agreed to and negotiated. They were not accidental. We had found that there were a lot of mistakes made in the initial PSO. So that, the factual change from the man trading to the man just possessing was a negotiated, well, it's there. It was agreed to. That's correct. That wasn't accidental. With regard to the court's ruling, the district court's ruling denying our 2G 2.2, she issued a memorandum ruling, which I was given the morning of sentencing. That's document 72, and she stated, quote, pursuant to the reasoning of the court in Gross, Scott, by using LimeWire and other peer-to-peer file-sharing programs, agreed to share the child pornography he gathered. And we submit that's error in and of itself. That's not enough. The court pointed out that to adopt such reasoning would conflict with the Vatnay, if I'm pronouncing it correctly, opinion. I would also point to the more recent 2015 opinion by the Ninth Circuit and Hernandez, where they followed that, and I think that would cause a split in the circuits. Other than that, I don't have anything helpful unless the court have any questions. Thank you very much. Thank you for your argument. Very good argument on both sides.